UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES PRATT, CARLA MURRAY, and ERIC GRIFFIN,<br><br>        Plaintiffs,<br><br>    v.<br><br>ILLINOIS DEPARTMENT OF CORRECTIONS and TERRY MCCANN, individually,<br><br>        Defendants. | Case No. 06-cv-847-JPG |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on the Motion for Summary Judgment filed by Defendant Illinois Department of Corrections (IDOC) as to the claims made by Plaintiff Carla Murray (Murray) (Doc. 29)[1]. Murray has responded to the motion (Doc. 35) and IDOC has replied to that response (Doc. 40). Murray alleges that IDOC, her former employer, is liable under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, for racial discrimination and for retaliation for a sexual discrimination and harassment complaint filed by Murray and others.[2] IDOC contends that one of Murray's claims is time barred and that Murray cannot establish a

---

[1]IDOC filed three separate summary judgment motions in this case, one addressed to each Plaintiff's claims. In ruling on each of the motions, the Court has been careful to confine its consideration to the evidence presented in connection with that particular motion and not to other evidence presented in connection with the other two motions, even if such evidence would have been relevant to the motion at hand. To the extent that the Court's rulings are inconsistent, that inconsistency is a product of the different evidence presented by the parties in connection with each motion and not by an improper application of the law.

[2]The Court construes this case as not asserting a "pattern-or-practice" Title VII cause of action. Although the Plaintiff's response to the summary judgment motion referred in passing to a "pattern-or-practice" theory, it analyzes this case as if it asserted only individual claims, confirming that she does not intend to assert such a claim.

case for racial discrimination or for retaliation. For the following reasons, the Court **GRANTS** the Motion.

## BACKGROUND

### I.     Standard for Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.,* 211 F.3d 392, 396 (7th Cir. 2000). The Court construes all facts in the light most favorable to the nonmoving party and draws all justifiable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Spath,* 211 F.3d at 396.

The moving party has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 323. If it meets this burden, the nonmoving party must set forth facts that demonstrate the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322-26; *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir. 1996). The nonmoving party must do more than cast "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000). Rather, the nonmoving party must demonstrate to the Court that the evidence is such that a reasonable jury could return a verdict in his favor. *Anderson,* 477 U.S. at 248; *Insolia v. Phillip Morris, Inc.,* 216 F.3d 596 (7th Cir. 2000). Mere assertions of a factual dispute unsupported by probative evidence will not

prevent summary judgment. *Anderson,* 477 U.S. at 248-250.

## II. Facts

Taken in the light most favorable to Murray, the evidence establishes the following facts.

### A. IDOC's Racial Discrimination Policy

Murray, an African American female, worked as a corrections officer (CO) at Shawnee Correctional Center (Shawnee), a medium security State facility operated and maintained by IDOC in Massac County, Illinois. At all relevant times, IDOC had a written policy regarding racial discrimination and retaliation, Administrative Directive (A.D.) 03.01.307. As of March 1, 2000, that policy prohibited discrimination or harassment based on a person's race or color. It defined harassment as:

> verbal or physical conduct that denigrates or shows hostility or aversion toward an individual . . . because of race. . ., and that has the purpose or effect of:
> 1. Creating an intimidating, hostile, or offensive working environment;
> 2. Unreasonably interfering with an individual's work performance; or
> 3. Otherwise adversely affecting an individual's employment opportunities.

A.D. 03.01.037 § II.E. The policy applied to the treatment of both employees and prisoners of the facility. The policy forbid engaging in or condoning racial discrimination or harassment, and obligated supervisors to "address[] any observed or reported incident of discrimination or harassment as a serious form of employee misconduct." *Id.* at § II.G.3. It also required an employee who witnessed or was aware of discriminatory or harassing behavior to report it in an incident report. *Id.* at § II.H.3. Wardens at Shawnee were required to work within the policy's guidelines. Additionally, Wardens were instructed to contact the Office of Affirmative Action if they ever became aware of racial harassment issues.

3

### B. Murray's Employment

Murray worked as a CO at Shawnee from December 2000 until June 2006. On or about October 30, 2002, Murray, along with other female CO's, filed a sexual harassment, sex discrimination, and retaliation claim with the EEOC. Later, fearing retaliation, Murray refused to cooperate with the EEOC investigation of the complaint.

On August 1, 2002, the Corrections Clerk at Shawnee retired, and interested employees were allowed to fill the position on a rotating basis for a period of 60-90 days. Interested employees were ranked on a list from most senior to least senior. Murray was qualified for the position and expressed her interest in filling it. She was placed on the list along with seven other candidates, all of whom were white. Of the eight employees on the list, Murray, as least senior, was ranked eighth. Murray was informed on October 2, 2003, that she would begin her 70 day stint as Corrections Clerk on October 20, 2003.

In January 2003 Warden Kim Bigley (Bigley) had requested that the Corrections Clerk position be replaced with an Office Associate position. Where the Corrections Clerk position had to be filled by a CO, an Office Associate position could be filled by a strictly clerical worker. Bigley's request was put on hold. In August 2003, the Corrections Clerk position was moved to a different part of the facility where there would be no inmate contact. Bigley then renewed her request that the position be abolished and replaced with an Office Associate position. The request was approved by Central Management Services on September 8, 2003. On October 1, 2003, Terry McCann (McCann) replaced Bigley as warden of Shawnee. Murray received written notification that the Corrections Clerk position had been abolished on October 17, 2003, just three days before she was to begin her turn in the position.

On September 24, 2004, Lieutenant Bowman (Bowman) told Murray that she was mandated to stay past her regular shift and work until 5:00 p.m. Murray, who had car-pooled into work that day, called her husband at work to tell him to pick her up at 5:00. Murray's husband worked in Cape Girardeau, an hour and a half away. Later, Bowman told Murray that he had made a mistake on the seniority list and that Murray would actually be required to stay until 7:00 or 8:00 p.m. Murray replied that her husband was on his way to pick her up, that she had no way of contacting him, that she had no other way to get home, and that she intended to leave at 5:00 p.m. Approximately 30 minutes later, Lieutenant Dillman called Murray to warn her that if she left before 7:00 or 8:00 p.m. she would be disciplined. At 5:00 p.m., when her husband arrived to pick her up, Murray left the institution.

Murray was called before an Employee Review Board (ERB) hearing, conducted by Kerry Camp (Camp), on a charge of abandoning her post. Camp was sympathetic to Murray's complaint that she had no transportation of her own and had relied on the initial 5:00 end of shift time given her by Bowman. Camp also indicated that the shift schedules for Murray's shift were in disarray and had been for months. He understood her frustration with the lack of notice she was given of the extension of her overtime shift. Still, Camp noted, Murray had left her post in violation of the terms governing her position. Accordingly, Camp recommended that Murray be disciplined for refusing mandatory overtime, and recommended a written reprimand. The reprimand was in accordance with a disciplinary process announced by Warden McCann's for dealing with employees's refusal to accept mandated overtime.

In a similar situation involving a white male CO, Sam Sparks, who had left his post 30 minutes early, Camp had recommended to Warden Bigley that Sparks be given a one-day

suspension. Bigley concurred with Camp's recommendation, and Sparks was given a one day suspension. However, Warden McCann refused to accept Camp's recommendation about the discipline to be given to Murray. McCann decided to discipline Murray for abandoning her post, a more serious charge than refusing overtime, and gave her a three day suspension. Murray grieved the three day suspension, and it was later reduced to a one day suspension.

Murray also heard white officers direct racial epithets such as "boys" and "nappy heads" at inmates. But she cannot recall who made such comments or when. McCann once told Lieutenant Groaning to direct Murray to remove a black sweater or jacket because it was not part of her official uniform. Murray observed white officers out of uniform who were allowed to continue wearing the unauthorized clothing, but she does not know if McCann saw them. Murray observed that Randall Adams, vice president of the union which represented Murray in grievance procedures at Shawnee, and his wife, Billy Adams, a CO at Shawnee, had state-issued licence plates reading "W Pride 1," "3KMan," and "3KWoman." The Secretary of State's office determined that the plates were racially offensive and revoked them However, IDOC never disciplined the Adamses for having or displaying the plates, even though IDOC was aware that some employees had complained about them.[3]

On April 23, 2005, Murray filed an EEOC complaint alleging racial discrimination and retaliation for filing the earlier EEOC sexual discrimination and harassment complaint. She has

---

[3]Murray also complains that Major Hoepker denied her "turnarounds" and "half shifts" that is, the opportunity, granted on a first-come first-served basis, for COs to take the shift ( or half the shift) off, if staffing needs are fully met without them. However, as Murray made no allegations in her EEOC complaint against Major Hoepker, nor any allegations reasonably like or related to the denial of turnaround or half-shift opportunities, these claims are not actionable in this Title VII case. *See Geldon v. South Milwaukee School Dist.*, 414 F.3d 817, 819 (7th Cir. 2005); *McKenzie v. Ill. Dept. of Transportation*, 92 F.3d 473, 481 (7th Cir. 1996).

exhausted all administrative remedies, and brought the instant suit within 90 days of receiving her right to sue letter from the EEOC.

## ANALYSIS[4]

Title VII prohibits discrimination on the basis of race: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race . . . ." 42 U.S.C. § 2000e-2(a)(1). It also prohibits retaliation against an employee who files an EEOC complaint for racial or sexual discrimination. "It is also an unlawful employment action for an employer to discriminate against any of his employees. . . because [the employee] has opposed any practice made an unlawful employment practice by this [subchapter], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this [subchapter]." 42 U.S.C.A. § 2000e-3(a). Claims must be filed in an EEOC complaint within 300 days of the act complained of in order to be actionable under Title VII. 29 C.F.R. § 160.13; *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

Murray has presented three claims: 1) the position of Corrections Clerk was abolished in order to prevent Murray from filling it because of her race; 2) Murray was brought before an

---

[4]Plaintiff's counsel seems to be under the impression that the Court is familiar with the background, history, facts and relevant law of this case. Counsel has neglected to appraise the Court of basic facts, and has misconstrued a number of facts. Moreover, counsel has failed to apply the facts of the case to the law she has cited. The Court must, once again, remind counsel that it is not its job to do counsel's work of organizing or formulating a party's arguments, *United States v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999), nor is it the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F. 3d 560, 562 (7th Cir. 1996). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

7

ERB hearing and suspended for leaving work early in retaliation for filing an EEOC report alleging sexual discrimination and harassment or because of her race; 3) because of her race, Murray was subjected to a work environment that was so hostile that it altered the conditions of her employment. The Court will examine each of the claims in turn.

I.  **Abolishment of the Corrections Clerk Position**

Murray learned that the Corrections Clerk position had been abolished on October 17, 2003. More than 400 days later, on April 23, 2005, she first filed a complaint with the EEOC. Claims must be filed with the EEOC within 300 days of the act complained of in order to be actionable under Title VII. 29 C.F.R. § 160.13; *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Murray's claim is therefore not timely, and she is barred from bringing it in this action.

Murray counters that the abolishment of the position in order to prevent her from filling it was not a "discrete act" actionable on its own, but must instead be considered as part of "a series of separate acts that collectively constitute one 'unlawful employment practice'" and so is not barred under the *Morgan* doctrine. She gives the Court no indication of what the other acts in this "series" might be. At any rate, it is clear that the abolishment of the position, if done in order to avoid giving a black CO the opportunity to fill it, is actionable in and of itself, thus beginning the 300 day time period. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002).
Murray did not file with the EEOC within 300 days of the abolishment of the position, consequently, she is barred from bringing a Title VII claim on it now. IDOC is entitled to summary judgment on this claim.

## II. ERB Hearing and Suspension

Murray was called before an ERB hearing and given a three day suspension (later reduced to a one day suspension) for leaving her post before the completion of a mandated overtime shift. Murray claims this was either in retaliation for her EEOC sexual discrimination complaint filed
two years before, or it was because of her race.

### A. McDonnell Douglas Burden Shifting Analysis

The plaintiff bears the initial burden of establishing, by a preponderance of the evidence, a prima facie case of either racial discrimination or retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If she is successful in establishing a prima facie case, she establishes a presumption of discrimination. *Id.* At this point, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its conduct. *Id.* If the defendant meets this requirement, the burden shifts back to the plaintiff to demonstrate, once again by a preponderance of the evidence, that the reasons proffered by the defendant are actually a pretext for discrimination. *Id.*

The plaintiff can establish a prima facie case for retaliatory discipline by presenting evidence sufficient to provide a basis for inferring intentional discrimination as motivating the employer's adverse employment action. *Gorence v. Eagle Food Ctrs, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). The plaintiff can either establish that she was treated less favorably than similarly situated individuals or she can establish other facts and circumstances which, taken together, would support an inference of intentional discrimination.

**B.      Similarly Situated Individuals**

The Plaintiff can establish a prima facie case for racially discriminatory or retaliatory discipline by showing that: 1) she is a member of a protected class; 2) she was meeting her employer's legitimate performance expectations; 3) she suffered an adverse employment action; 4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Where, as here, an employee admits to having broken a rule, but claims that she was treated more harshly than other rule-breakers, the second prong, meeting the employer's legitimate performance expectations, is not necessary to the analysis. *Oest v. Ill. Dept. Of Corrections*, 240 F.3d 605, 612 n.3 (7th Cir. 2001). Instead, the Court will assume Murray was meeting IDOC's legitimate performance expectations and proceed from there.

First, Murray was indisputably a member of a protected class, whether as an African American or as an individual who had filed a prior EEOC complaint. Second, as noted above, the Court assumes Murray was meeting IDOC's legitimate performance expectations. Third, IDOC concedes that a suspension is an adverse employment action. Finally, Murray claims that she was treated more harshly than a similarly situated employee, Sparks, who was not a member of a protected class. IDOC contends that Sparks was neither similarly situated to Murray, nor punished less harshly than she.

"Where a plaintiff claims that [she] was disciplined by [her] employer more harshly than a similarly situated employee based on some prohibited reason, a plaintiff must show that [she] is similarly situated with respect to performance, qualifications and conduct. Such a showing normally entails establishing that the two employees dealt with the same supervisor. . . ." *Snipes*

*v. Ill. Dept. of Corrections*, 291 F.3d 460, 463 (7 th Cir. 2002) (citations omitted). Generally "[d]ifferent employment decisions, concerning different employees, made by different supervisors . . . sufficiently account for any disparity in treatment, thereby preventing an inference of discrimination." *Radue v. Kimberly-Clark Corp.*, 219 f.3d 612, 617 (7th Cir. 2000) (citations omitted).

Here, Sparks was disciplined by Warden Bigley, while Murray was disciplined by Warden McCann. Additionally, the only decision maker Murray and Sparks had in common, Camp, actually treated Murray more favorably that Sparks. Camp recommended that Sparks receive a one day suspension, whereas he recommended that Murray receive only a written reprimand. Finally, in the end, McCann agreed to reduce Murray's suspension from three days to one day, the same discipline given to Sparks. In sum, Murray cannot show that Sparks was a similarly situated employee, as they were disciplined by different wardens, nor can she show that Sparks was treated more favorably than she was by either Camp or McCann. Because Murray cannot point to a similarly situated employee who was treated more favorably than she, she cannot make her prima facie case of discrimination in this manner

### C. Other Evidence of Intentional Discrimination

Alternatively, Murray can present other evidence which, taken as a whole, provides a basis for inferring intentional discrimination. She has not done so here. The timing of the adverse action in relation to the filing of the EEOC claim is not suspicious, as almost two years had passed.[5] Murray points to no other evidence which would provide a basis for a finding of

---

[5]Murray points to evidence that one of the other female employees who filed the EEOC claim at the same time received her right to sue letter from the EEOC sometime in September of 2003. However, she presents no evidence that she herself ever requested or received a right to

11

intentional discrimination. Because she has not submitted evidence which would support a finding of intentional discrimination or retaliation, Murray has not presented a prima facie case under *McDonnell Douglas*. Therefore, the Court need not examine whether IDOC can state a non-discriminatory reason for suspending Murray. IDOC is entitled to summary judgment on this claim.

## III.    Hostile Work Environment

Murray also claims that she suffered racial discrimination in the form of a hostile work environment in violation of Title VII.

> To survive a summary-judgment motion, an employee alleging racial harassment must show: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability.

*Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004). If the harassment comes from the employee's supervisor, the employer is strictly liable subject to an affirmative defense, applicable only where there has been no tangible employment action. *Id*. If the employee is harassed by a coworker, the employee must show that the employer has been negligent in either discovering or remedying the harassment. *Id.*

Murray alleges that her work environment was rendered abusive because two co-workers had racially offensive license plates on their cars, she was told to take off a non-uniform sweater or jacket, and unknown individuals used racially derogatory terms in her presence at unknown times.

---

sue letter. As a result, she has no evidence that the timing of the adverse employment action was at all suspicious.

No reasonable jury could conclude from the evidence presented by Murray that she was subject to such severe or pervasive racial harassment as to constitute a hostile work environment. Most significantly, Murray never reported any racist comments to IDOC, despite the fact that IDOC maintains a procedure for doing so, and cannot even remember who may have made such comments or when.[6] This failure to report undercuts Murray's assertion now that she was offended by these comments. Furthermore, even if Murray had found the comments offensive, IDOC cannot be found to have been negligent in discovering or remedying harassing behavior conducted by unknown individuals at unknown times.

Furthermore, no reasonable jury could find that Murray was told to remove her non-uniform sweater or jacket because of her race. First, Murray cannot say whether McCann, who ordered her to remove the sweater, ever saw Murray's white counterparts out of uniform. Second, Murray presents no evidence but her own conclusory assertions that she was treated differently in regards to IDOC's uniform policy than her white colleagues. This is insufficient to defeat summary judgment. *Oest*, 240 F.3d at 613.

As for the racist licence plates, Murray alleges that IDOC knew that there were complaints about the licence plates, but she points to no evidence that IDOC was aware of the nature of those complaints until after the licences were revoked by the Secretary of State. In any event, the sentiments displayed on the plates, while ugly and offensive, were not so severe or

---

[6]Murray claims that she cannot remember who made these comments or when because they were "done so often" and "by so many." While the Court is sympathetic to the problem of remembering exact dates and times of repeatedly occurring conduct, the Court finds it problematic that Murray could not remember a single individual who made such offensive comments. Especially problematic is the fact that Murray cannot say if the comments were made by a supervisor or coworker, which, as noted above, changes IDOC's potential liability for the actions.

pervasive as to constitute an alteration of the conditions of Murray's employment sufficient to maintain this claim, even when taken in conjunction with Murray's other complaints. Accordingly, IDOC is entitled to summary judgment on this claim.

## CONCLUSION

In conclusion, none of Murray's claims have survived summary judgment. Therefore, the Court **GRANTS** IDOC's Motion for Summary Judgment as to the Claims Made by Plaintiff Carla Murray (Doc. 29). The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**

**DATED: December 11, 2007**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
